716 So.2d 753 (1998)
Moses E. WILLIAMS
v.
STATE.
CR-96-1422.
Court of Criminal Appeals of Alabama.
May 8, 1998.
Jerry M. Blevins, Montgomery, for appellant.
Bill Pryor, atty. gen., and Cecil G. Brendle, Jr., asst. atty. gen., for appellee.

On Application for Rehearing
BASCHAB, Judge.
This court's opinion of October 31, 1997, is withdrawn and the following is substituted therefor.
The appellant, Moses E. Williams, pled guilty to possession of a controlled substance, see § 13A-12-212, Ala.Code 1975, and was *754 sentenced to 15 years imprisonment. That sentence was split, and he was ordered to serve 2 years. Before entering his guilty plea, the appellant moved to suppress evidence of the crack cocaine found in his pocket, arguing that the officers did not have a reasonable suspicion to stop him. Therefore, the appellant alleges that the crack cocaine seized was the "fruit of a poisonous tree." Upon entering his guilty plea, he specifically reserved his right to appeal the suppression issue. This appeal followed.
The appellant argues that the trial court erred in denying his motion to suppress. According to the appellant, the field interview conducted by the police officers constituted an illegal seizure, and any evidence obtained pursuant to that seizure should have been suppressed. We disagree.
On May 15, 1997, Montgomery police officers W.B. Hamil and S.D. Lockridge were patrolling on Martha Street, in the area of a construction site. The area had been the site of recent burglaries, and the Montgomery Police Department had increased patrol in response to reports of those burglaries. While on patrol, Officers Hamil and Lockridge saw the appellant. He was not walking along the street, but through the construction site that had been the target of several burglaries. They stopped the appellant at 5:20 p.m. and, although it was still daylight, the appellant was the only person in the area. The police officers were in a marked patrol car. According to Officer Lockridge, the appellant acted nervous when he saw the officers. Lockridge explained that, "[w]hen he saw our vehicle, he started looking down in different directions. He turned and started walking away in a different direction from us. His actions were real jerky and jittery.... Like, when he saw our patrol vehicle, it kind of startled him. That was my observation." (R. at 20.) Officers Hamil and Lockridge approached the appellant and asked him his name, his date of birth, his address, and where he was going. The officers then checked for outstanding warrants on the appellant through local and National Crime Information Center (NCIC) computer databases. The check revealed that the appellant had three outstanding warrants. He was placed under arrest and the officers conducted a search pursuant to the arrest. During the search, they found crack cocaine in the appellant's front right pocket.
The appellant assumes that his encounter with Officers Hamil and Lockridge constituted a seizure that triggered Fourth Amendment protections. However,
"`"[i]t is well settled that not every encounter between police officers and citizens constitutes a seizure within the protection of the Fourteenth Amendment. United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, [1877] 64 L.Ed.2d 497 (1980); Terry v. Ohio, 392 U.S. 1, 19, n. 16, 88 S.Ct. 1868, 1879, n. 16, 20 L.Ed.2d 889 (1968). `There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets.' Terry, 392 U.S. at 34, 88 S.Ct. at 1886 (Justice White, concurring). A stop `of a restricted investigative scope conducted in a non-coercive manner ... [does] not trigger Fourth Amendment protection at all.' United States v. Willis, 759 F.2d 1486, 1495 (11th Cir.), cert. denied, 474 U.S. 849, 106 S.Ct. 144, 88 L.Ed.2d 119 (1985)."'"
Bush v. State, 695 So.2d 70, 122 (Ala.Cr.App. 1995) (quoting Fields v. State, 582 So.2d 596, 597 (Ala.Cr.App.1991)). The test used to determine whether a seizure has occurred for Fourth Amendment purposes is "whether the police engaged in a show of authority that would lead a reasonable person, innocent of any crime, to conclude that the person was not free to go under all the circumstances. United States v. Castellanos, 731 F.2d 979 (C.A.D.C.1984)." Bush, 695 So.2d at 123. In Bush, officers stopped a man on a motorcycle whose general build matched a general description of a murder suspect. The officers asked him his name, his address, and whether he had ever been in jail or had ever been arrested. The police also ran his name through the NCIC computer to see if there were any outstanding warrants. In Bush, we held:
"Given all the circumstances presented here, we do not believe that the presence of the officers together with the request for identification and other information *755 would have led a reasonable person to conclude that he or she was being compelled to respond and was not free to leave. What we have here is a stop of a restricted investigative scope, conducted in a noncoercive manner. It did not amount to a seizure and, thus, did not trigger Fourth Amendment protections."
Id.
In this case, Officers Hamil and Lockridge approached the appellant as he was walking in the area of Martha Street. Both officers explained that they conducted a standard field interview with the appellant to ascertain his name and his address. Furthermore, there is nothing to suggest that the officers exercised any show of authority or that they exhibited any coercive conduct. Officer Lockridge stated that the appellant supplied the information voluntarily. The evidence presented during the suppression hearing shows that the encounter between the appellant and the officers was a restricted investigatory stop that did not implicate the Fourth Amendment.
Furthermore, even if a seizure had occurred, the trial court properly denied the appellant's motion to suppress because the officers had a reasonable suspicion to stop the appellant.
It is well established that
"a police officer may make a brief investigatory detention based upon a `reasonable suspicion' of criminal activity. This court in State v. Bodereck, 549 So.2d 542, 545-46 (Ala.Cr.App.1989), quoting from United States v. Post, 607 F.2d 847, 850 (9th Cir. 1979), discussed `reasonable suspicion' as mentioned in Terry and stated:
"`"[T]he quantum of cause necessary to justify an investigatory stop is a `reasonable' or `founded' suspicion that the person has committed or is about to commit a criminal act.... The founded suspicion must arise from specific facts and not inchoate hunches, but the officer is entitled to draw inferences from those facts in light of his experience."'"
Gaskin v. State, 565 So.2d 675, 677 (Ala.Cr. App.1990) (emphasis added). When evaluating whether reasonable suspicion for a stop exists, we require that the police officer be able to
"`point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. Terry v. Ohio.... The appropriate question to ask is "... [W]ould the facts available to the officer at the moment of the seizure or the search `warrant a man of reasonable caution in the belief that the action taken was appropriate?". Terry v. Ohio,... Daniels v. State, 290 Ala. 316, 276 So.2d 441 (1973).'

"Sterling v. State, 421 So.2d 1375, 1379 (Ala.Cr.App.1982)."
Gaskin, 565 So.2d at 677.
The officers in this case presented specific articulable facts to justify the stop of the appellant. First, the appellant was in an area that had been the site of recent burglaries. The appellant was not only in a high-crime neighborhood, but was also walking through the very construction site that had recently been burglarized on several occasions. Furthermore, he began acting nervous when he saw the police vehicle, and he even went so far as to start walking in another direction.
We recognize that the fact that a person is in a high-crime area, by itself, is not enough to create a reasonable suspicion. However, "an area's disposition toward criminal activity is an articulable fact to be considered." Gaskin, 565 So.2d at 677 (citing United States v. Moore, 817 F.2d 1105 (4th Cir.1987), cert. denied, 484 U.S. 965, 108 S.Ct. 456, 98 L.Ed.2d 396 (1987)).
This court was not presented with a situation where the appellant was stopped solely because he was in a high-crime neighborhood. Officer Lockridge testified that it was the appellant's actions, coupled with the fact that he had been walking through an area where there had been recent burglaries, that caused him to stop the appellant. Reasonable suspicion may be found when the accused is in a high-crime area and his "conduct contributed to the police officer's suspicion." Id. at 678.
*756 Neither officer saw the appellant engaged in any criminal activity before he was stopped. However, the law does not require that the appellant be engaged in illegal activity before an officer may make an investigative stop.
"`"[T]he relevant inquiry in evaluating the presence of reasonable suspicion is `"not whether particular conduct is `innocent' or `guilty,' but the degree of suspicion that attaches to particular types of non-criminal acts."'"' State v. Washington, 623 So.2d at 397 (quoting United States v. Tapia, 912 F.2d 1367, 1370 (11th Cir.1990)) (quoting United States v. Sokolow, 490 U.S. 1, 10, 109 S.Ct. 1581, 1587, 104 L.ED.2d. 1 (1989), and Illinois v. Gates, 462 U.S. 213, 243-44 n. 13, 103 S.Ct. 2317, 2334-35 n. 13, 76 L.Ed.2d 527 (1983))."
Hopkins v. State, 661 So.2d 774, 782 (Ala.Cr. App.1994). When reviewing the degree of suspicion that attaches to noncriminal behavior, courts should give great deference to the training and experience of police officers. This court has noted that "`[w]hile many factors which can contribute to a reasonable suspicion of criminal activity are subject to a variety of interpretations, it is the experience of an officer that allows him to bring the factors together into a meaningful whole demonstrating reasonable suspicion of criminal activity.'" Id. at 779 (quoting 2 W. Ringel, Searches and Seizures, Arrests and Confessions § 13.4(a) (2d ed.1994)). Based on the totality of the circumstances, there were articulable facts to create a reasonable suspicion that criminal activity was afoot. Compare Huffman v. State, 651 So.2d 78 (Ala.Cr. App.1994) (holding that there was reasonable suspicion where officers observed the accused sitting in a car at a closed service station that had recently been burglarized).
Both officers testified that they did not believe that the appellant had committed or was in the process of committing a crime. No testimony was elicited regarding whether either of the officers believed that a crime was about to be committed. However, lack of such testimony did not invalidate the trial court's finding of reasonable suspicion. Reasonable suspicion, like probable cause, is measured using an objective standard. "`"Probable cause is measured against an objective standard.... If this objective test is met, it is unnecessary that the officer hold a subjective belief that he has a basis for making the arrest."`" Hopkins v. State, 661 So.2d 774, 780 (Ala.Cr.App.1994) (citations omitted.) As stated earlier, the true test of a Terry stop is whether a reasonably cautious person would have believed the stop was justified. Gaskin, 565 So.2d at 677.
Because the officers had a reasonable suspicion to justify the stop, the trial court properly denied the motion to suppress. Based on the foregoing, the judgment of the trial court is affirmed.
APPLICATION FOR REHEARING GRANTED; OPINION OF OCTOBER 31, 1997, WITHDRAWN; OPINION SUBSTITUTED; RULE 39(k) MOTION DENIED; AFFIRMED.
McMILLAN and BROWN, JJ., concur.
LONG, P.J., concurs in part and concurs in the result in part.
COBB, J., concurs in the result only.
LONG, Presiding Judge (concurring in part and concurring in the result in part).
I concur with the majority's opinion to the extent that it holds that the evidence presented at the suppression hearing did not establish that a seizure occurred for Fourth Amendment purposes when the police officers initially approached the appellant and put questions to him as part of a "standard field interview." There being no showing of a seizure at that point in the encounter, it was not necessary that the officers' actions up to that point be justified by a "reasonable suspicion" that the appellant had committed or was about to commit a crime. See Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Based on the evidence that was presented, there was no seizure until the officers placed the appellant under arrest and began the search of his person that led to their discovery of the cocaine in his pocket. The arrest was made and the search was initiated only after the officers had learned over the police radio that there were warrants pending for the appellant's arrest. *757 With the information that there were outstanding warrants, the officers had probable cause for an arrest. The search pursuant to the arrest was lawful, and the cocaine discovered in the appellant's pocket during that search was lawfully seized.
The appellant bore the burden of establishing whether and at what point a "seizure" occurred. See 5 W. LaFave, Search and Seizure § 11.2(b) at 44-45 (3d ed. 1996) ("The defendant also has the burden of proof as to whether there was sufficient government involvement in seemingly private conduct and whether a seizure occurred."); United States v. Carhee, 27 F.3d 1493, 1496 (10th Cir.1994) ("[the defendant] bears the burden of proving whether and when the Fourth Amendment was implicated (i.e., the point at which he or his luggage was `seized'")). However, the appellant appears to have assumed that the officers' actions in approaching and questioning him amounted to a seizure, and he failed to present any evidence suggesting that a reasonable person in his place would not have believed that he was free to leave. See Bush v. State, 695 So.2d 70, 123 (Ala.Cr.App.1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, ___ U.S. ___, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997). The state did not concede the seizure question at the suppression hearing, where the prosecutor, while also maintaining that the officers were justified in stopping the appellant based on Terry`s "reasonable suspicion" standard, argued that there was no indication that the officers detained the appellant when approaching and questioning him and that the evidence indicated that the appellant "could freely go" at that point. (R. 26.) The prosecutor also argued the lesson of United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), and its progeny by insisting that "the officers have every right to approach a citizen and ask questions." (R. 27.)
Because there was an absence of evidence that a seizure occurred at any point before the officers acquired probable cause for an arrest and search of the appellant, I agree with the majority that the trial court correctly denied the appellant's motion to suppress the state's evidence.
However, I do not agree with the majority to the extent that it holds that if a Fourth Amendment seizure did occur at the point in the encounter when the officers approached and questioned the appellant, the officers were justified in making such a stop based on a reasonable suspicion. Because I do not believe that the officers presented specific articulable facts to justify an initial Terry-stop, I agree with the substance of Judge Cobb's discussion of this issue in her special writing.
COBB, Judge, concurring in result only.
I was originally assigned this case and, after much deliberation, I drafted the original opinion reversing the appellant's conviction. There were two dissents to that opinion. The State of Alabama filed an application for rehearing and a Rule 39(k), Ala.R.App.P., motion. A question obliquely raised in the State's application for rehearing was one of "seizure" and whether the police had actually "seized" Williams on the day of the incident. Because I did not believe the record had been adequately developed to allow us to appropriately answer that question, I recommended that we deny the State's application for rehearing. Nevertheless, this court granted the application and the case was reassigned.
If the majority chose to dispose of this case based solely on the "seizure" question, I would be less disturbed. My greatest concern is caused by the majority's holding that... "even if a seizure had occurred, the trial court properly denied the appellant's motion to suppress because the officers had a reasonable suspicion to stop the appellant."
Before the requirement of reasonable suspicion can be imposed on the police, it must be proved that the appellant was actually seized when he was stopped by the police. I remain personally concerned that we are unduly infringing on a citizen's right to movement[1]. Nevertheless, I understand how the *758 trial court could or should be affirmed in its denial of the motion to suppress because Williams's confrontation with the police did not amount to a seizure.
The determination of this issue is complicated by the fact that neither the State nor the appellant recognized this issue at trial or on appeal. Consequently, the record was never developed in order to answer the threshold question whether there was an actual seizure of Williams. The questions propounded by both sides focused on whether the police officers had an articulable reasonable suspicion that Williams had committed, or was about to commit, a criminal offense. The test for whether a seizure has occurred has been repeatedly stated by the Supreme Court:
"`A person has been seized within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' California v. Hodari D., 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991); Michigan v. Chesternut, 486 U.S. 567, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988); Immigration & Naturalization Service v. Delgado, 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984); United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).'
"The Supreme Court in Hodari D. further defined what constitutes a `seizure' under the above test. `In [Hodari D.], the United States Supreme Court held that a seizure does not occur when, without more, a police officer makes a "show of authority" to an individual and the individual fails to yield to the officer's authority.' Hopkins v. State, 661 So.2d 774, 777 (Ala.Cr. App.1994).
"....
"... `Thus, a seizure requires either physical control over the suspect, or the suspect must in some form submit to the officer's show of authority.' Hopkins, 661 So.2d at 777."
Sawyer v. City of Marion, 666 So.2d 113, 114-15 (Ala.Cr.App.1995).
The United States Supreme Court in Mendenhall, enumerated the factors a court could use to determine if a citizen's Fourth Amendment rights had been violated.
"Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. See Terry v. Ohio, supra, at 19, n. 16, 88 S.Ct. 1868; Dunaway v. New York, 442 U.S. 200, 207, n. 6, 99 S.Ct. 2248, 60 L.Ed.2d 824 [(1979)]; 3 W. Lafave, Search and Seizure 53-55 (1978). In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person."
United States v. Mendenhall, 446 U.S. 544, 553-55, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (plurality opinion of Stewart, J.) (footnote omitted). In analyzing random police-citizen encounters, courts must pay careful attention to the specific facts in each case. The record in this case simply lacks the necessary detail. Because we are unable to determine from the record whether these circumstances were present when Williams was stopped, I am in agreement that Williams's appeal must fail.[2]
*759 The majority, however, goes further by holding that the police officers had reasonable suspicion to stop Williams. It is this erroneous conclusion that prompts this special writing.
The evidence presented at the suppression hearing was uncontroverted. Officer W.B. Hamil of the Montgomery Police Department testified that on May 15, 1996, at about 5:20 p.m., he and Officer S.D. Lockridge were in a police car patrolling an area where several burglaries had recently been reported. Hamil testified that several houses were under construction in the area. Hamil testified that he saw Williams walking away from the construction area as the patrol car approached Williams. Officers Hamil and Lockridge then detained Williams and performed a "field check" on him. Hamil testified that the field check consisted of asking Williams his name and his date of birth, as well as asking him what he was doing in the area. The officers held Williams so that they could ascertain whether he had any outstanding warrants. During this time the officers discovered, over a police radio, that there were warrants pending for Williams's arrest. After Williams was arrested, the officers performed a pat-down search on him and found crack cocaine in one of his pockets.
Officer Lockridge's testimony as to Williams's field check and subsequent arrest was nearly identical to Officer Hamil's. Officer Lockridge testified that Williams appeared to be nervous and that he started walking in a direction different from the one in which he had been walking as the patrol car approached him.
Both officers testified that before they stopped him they had no reason to believe that Williams had committed a crime. Additionally, neither officer testified that there was any reason to believe that he was preparing to commit a crime when he was stopped. Both officers testified that Williams was walking in a public area. Hamil testified that Williams was stopped only because he was walking through an area where several crimes had been reported. Lockridge cited the same reason for stopping Williams and added that Williams was also stopped because he appeared nervous and because he changed the direction in which he was walking as the patrol car approached.
"The United States Supreme Court, in Terry v. Ohio, 392 U.S. 1 [88 S.Ct. 1868, 20 L.Ed.2d 889] (1968), held that a police officer may make a brief investigatory stop upon a reasonable suspicion of criminal activity. This court in State v. Bodereck, 549 So.2d 542, 545-46 (Ala.Cr.App.1989), quoting from United States v. Post, 607 F.2d 847, 850 (9th Cir.1979), discussed `reasonable suspicion' as mentioned in Terry and stated:
"`"[T]he quantum of cause necessary to justify an investigatory stop is a `reasonable' or `founded' suspicion that the person has committed or is about to commit a criminal act.... The founded suspicion must arise from specific facts and not inchoate hunches, but the officer is entitled to draw inferences from those facts in light of his experience."
"`....
"`Standards of "reasonable suspicion" under Terry, [392 U.S. 1, 88 S.Ct. 1868] were further clarified by the United States Supreme Court in United States v. Cortez, 449 U.S. 411, 421, [101 S.Ct. *760 690] S.Ct. 690, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), in which the Court held:
"`"Courts have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person. Terms like `articulable reasons' and `founded suspicion' are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise. But the essence of all that has been written is that the totality of the circumstancesthe whole picturemust be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity."'

"This court has also written:
"`In justifying the particular intrusion, the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. Terry v. Ohio.... The appropriate question to ask is "... [W]ould the facts available to the officer at the moment of the seizure or the search `warrant a man of reasonable caution in the belief' that the action taken was appropriate?". Terry v. Ohio,... Daniels v. State, 290 Ala. 316, 276 So.2d 441 (1973).'
Gaskin v. State, 565 So.2d 675, 677 (Ala.Cr. App.1990) (emphasis in original).
There is substantial caselaw to support a police officer's reasonable suspicion for a stop where the person is detained in an area known to be a high crime area and the person's conduct contributed to the police officer's suspicion that he or she was engaged in criminal conduct. (See United States v. Espinosa, 827 F.2d 604 (9th Cir.1987) cert. denied, 485 U.S. 968, 108 S.Ct. 1243, 99 L.Ed.2d 441 (1988); United States v. Trullo, 809 F.2d 108 (1st Cir.), cert. denied, 482 U.S. 916, 107 S.Ct. 3191, 96 L.Ed.2d 679 (1987)). Here, however, other than the fact that Williams changed the direction in which he was walking, there was no evidence that Williams attempted to elude the officers or to conceal anything from them as they approached him. Compare Gaskin v. State, 565 So.2d 675 (Ala.Cr.App.1990) (where the arresting officer approached the appellant, who was driving a truck in a high-crime area and had stopped to talk to a pedestrian, and the appellant drove off at a lawful speed, facts were insufficient to justify a Terry stop).
Both officers testified that when they stopped him they did not have reasonable suspicion to believe that Williams was engaged in criminal activity. The only two reasons articulated for the stop were that Williams was in an area where crimes had recently been reported and that Williams appeared to be nervous and changed his direction as the patrol car approached him. Both officers testified that they did not see Williams doing anything unlawful before he was stopped.
Based on the totality of the circumstances, in order to rise to the level of reasonable suspicion, the detaining officers' basis for suspecting Williams of criminal activity must have been particularized and objective. The officers themselves denied that they held such suspicion. I am disturbed that the majority concluded that they did; therefore, I concur in the result only.
NOTES
[1] Several law review articles have addressed the trend of removing police-citizen encounters from Fourth Amendment Protection. E.g., Tracey Maclin, The Decline of the Right of Locomotion; The Fourth Amendment of the Streets. 75 Cornell L.Rev. 1258 (1990). Edwin J. Butterfoss, Bright Line Seizures: The Need for Clarity in Determining when Fourth Amendment Activity Begins. 79 J.Crim.L. & Criminology 437 (1988).
[2] This troubling constitutional problem arises out of the necessity of balancing the State's interest in making our streets safe from criminal activity with preventing unnecessary governmental intrusion into the lives of citizens who are not involved in criminal activity. The following excerpt from an article that appeared in the Duquesne Law Review accurately states my concern about random police-citizen encounters involving pedestrians:

"The consensual encounters remain sufficiently non-coercive and outside the scope of Mendenhall/Royer as long as the citizen cooperates with the police. However, if the citizen refuses to cooperate or wishes to disregard the questioning, he has the constitutional right to do so and the police must disengage the encounter unless the detention can be justified by reasonable suspicion. Herein lies the problem. If the citizen refuses to reply or walks away, the authorities will deem such refusal to cooperate as justification for a prolonged detention. Conversely, if the citizen answers the initial, generalized questions and no suspicion or criminality is exposed, the officer will often escalate the encounter by asking the individual if he would consent to a luggage or body search. In either scenario, the intrusion is escalated without justification.
"More importantly, in both situations, the citizen is unlikely to feel that he is free to leave given the suddenly accusatory environment. In reality, the citizen's liberty has been restrained and his freedom of movement curtailed. The courts will assert that no seizure has occurred and the police conduct remains outside the scope of the Fourth Amendment. By categorizing the encounter as consensual, the police questioning will not implicate the Mendenhall/Royer reasonable person test and can continue or even escalate without justification. The practical effect of such tactics is the deterioration of the Fourth Amendment and the privacy interest it seeks to protect.
Robert J. Burnett, Random Police-Citizen Encounters: When is a Seizure a Seizure?. 33 Duq. L.Rev. 283, 288-89 (1995).